## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| HEATHER WATKINS, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | CLASS ACTION |
| ASCENSION HEALTH, | JURY TRIAL DEMANDED |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Heather Watkins ("Plaintiff"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through her attorneys, brings this Class Action Complaint against Defendant Ascension Health ("Ascension" or "Defendant"), and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

## INTRODUCTION

1.      Plaintiff brings this class action against Ascension for its failure to secure and safeguard approximately 437,329 individuals', including Plaintiff's, personally identifying information ("PII") and personal health information ("PHI"), including names, addresses, phone numbers, email addresses, dates of birth, race, gender, Social Security numbers, and clinical information such as place of service, physician name, admission and discharge dates, diagnosis and billing codes, medical record number, and insurance information.

2.      Ascension is a healthcare provider headquartered in St. Louis, Missouri, with locations in several other states.

3.      On or about December 5, 2024, Ascension discovered that patient information was involved in a security incident in which an unauthorized third party gained access to one of

Ascension's third-party vendor's network systems and acquired files containing the PII/PHI of Ascension's patients, including Plaintiff and Class members (the "Data Breach").

4. Ascension owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Ascension breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its patients' PII/PHI from unauthorized access and disclosure.

5. As a result of Ascension's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all persons whose PII/PHI was exposed as a result of the Data Breach, which Ascension discovered on or about December 5, 2024.

6. Plaintiff, on behalf of herself and all other Class members, asserts claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

*Plaintiff Heather Watkins*

7. Plaintiff is a citizen and resident of Tennessee.

8. Plaintiff obtained healthcare services from Ascension. As a condition of providing healthcare services to Plaintiff, Ascension required Plaintiff to provide it with her PII/PHI.

9. Based on representations made by Ascension, Plaintiff believed that Ascension had implemented and maintained reasonable security and practices to protect her PII/PHI. With this

belief in mind, Plaintiff provided her PII/PHI to Ascension in exchange for receiving healthcare services from Ascension.

10.    At all relevant times, Ascension stored, maintained, and shared Plaintiff's PII/PHI, including with the third-party vendor impacted in the Data Breach.

11.    Plaintiff received a letter from Ascension notifying her that her PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

12.    Plaintiff spent time and effort checking her credit and researching the Data Breach. She has also experienced a significant increase in the number of spam calls, texts, and emails she receives since her information was stolen in the Data Breach.

13.    As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her PII/PHI.

***Defendant Ascension Health***

14.    Defendant Ascension Health is a Missouri nonprofit corporation with its principal place of business located at 4600 Edmundson Rd., Saint Louis, MO 63134. It may be served through its registered agent: CSC-Lawyers Incorporating Service Company, 221 Bolivar St., Jefferson City, MO 65101.

## JURISDICTION AND VENUE

15.    The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is

a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy

exceeds $5,000,000, exclusive of interest and costs.

16.     This Court has general personal jurisdiction over Ascension because it is organized

under the laws of this State and maintains its principal place of business in this District.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Ascension's

principal place of business is in this District and a substantial part of the events, acts, and omissions

giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Ascension*

18.     Ascension is a healthcare provider with locations in 16 states including Florida,

Illinois, Indiana, Kansas, Maryland, Michigan, Oklahoma, Tennessee, Texas, and Wisconsin.[1]

Ascension has approximately 26,000 affiliated providers, 106,000 associates, and operates 105

hospitals.[2] It offers a wide range of healthcare services, including cancer, cardiology, neurology,

and orthopedic care.[3]

19.     In the regular course of its business, Ascension collects and maintains the PII/PHI

of its patients, including Plaintiff and Class members. Ascension requires patients to provide it

with their PII/PHI, including the PII/PHI stolen in the Data Breach, before it provides them

healthcare services.

---

[1]   *Compassionate care when and where you need it*, ASCENSION HEALTH, https://healthcare.ascension.org/ (last accessed May 14, 2025).
[2] *Id.*
[3]   *Specialty Care*, ASCENSION HEALTH, https://healthcare.ascension.org/specialty-care (last accessed May 14, 2025).

20.     On its website, Ascension promises it develops relationships "based on honesty, fairness and mutual trust."[4] Ascension also promises it "will operate in accordance with all laws and regulations applicable to Ascension."[5] Ascension admits it is required to "[m]aintain [the] privacy and security of protected health information in keeping with HIPAA."[6]

21.     Ascension further promises its associates "are expected to: maintain the confidentiality of all organization information; access, use and disclose confidential and proprietary information only for which they are authorized; keep confidential and proprietary information secure when not using the information; and refrain from discussing confidential and proprietary information with unauthorized personnel or outside sources."[7] Ascension also states associates will "not disclose confidential information related to Ascension to any outside unauthorized person or organization."[8]

22.     Ascension's website contains Notices of Privacy Practices (the "Privacy Policy") for each state in which it has locations,[9] which are substantively identical.[10] The Privacy Policy

---

[4] *Ascension Standards of Conduct*, ASCENSION HEALTH (July, 2023), https://about.ascension.org/-/media/project/ascension/about/section-about/ascension-compliance-program.pdf (last accessed May 14, 2025).

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Notice of Privacy Practices*, ASCENSION HEALTH, https://healthcare.ascension.org/npp (last accessed May 14, 2025).

[10] *Compare Ascension Michigan Joint Notice of Privacy Practices*, ASCENSION HEALTH (Jan. 1, 2023), https://healthcare.ascension.org/-/media/healthcare/npp/michigan/mi_ascension-michigan_english.pdf (covering all "Ascension health care providers located in Michigan"), *with Ascension Saint Thomas Joint Notice of Privacy Practices*, ASCENSION HEALTH (Jan. 1, 2023), https://healthcare.ascension.org/-/media/healthcare/npp/tennessee/tn_ascension-saint-thomas_english.pdf (covering all "Ascension health care providers located in Tennessee").

describes the different ways Ascension may use and disclose patients' health information, including for "for treatment, payment, and health care operations purposes."[11]

23.    In the Privacy Policy, Ascension states it may share PII/PHI with its business associates who provide services for or on Ascension's behalf.[12] Ascension promises its patients that "[a]ll of our business associates are required to protect the privacy and security of your health information just as we do."[13] Ascension promises patients it will "make reasonable efforts to limit" incidental disclosures of PII/PHI."[14]

24.    Ascension also promises that it will share PII/PHI for "any other reasons not described in" the Privacy Policy only with a patient's written permission.[15] It further promises patients it "will not use or share your information other than as described here unless you tell us we can in writing."[16]

25.    Ascension admits in the Privacy Policy that its "use and disclosure of certain sensitive information may also be further restricted by other federal or state laws."[17] It also admits it is "required by law to maintain the privacy and security of your health information."[18]

26.    Ascension states it will notify patients "if a breach occurs that may have compromised the privacy or security of your identifiable health information."[19]

---

[11] *E.g.*, *Ascension Saint Thomas Joint Notice of Privacy Practices*, *supra* note 10.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

27.    In the Privacy Policy, Ascension tells its patients it "must follow the practices described in this Notice and provide you a copy of it."[20]

28.    Plaintiff and Class members are current or former patients of Ascension who entrusted their PII/PHI to Ascension in exchange for healthcare services.

### *The Data Breach*

29.    On or about December 5, 2024, Ascension "learned that Ascension patient information may have been involved in a potential security incident."[21] Following an investigation, on or about January 21, 2025, Ascension "determined that Ascension inadvertently disclosed information to a former business partner, and some of this information was likely stolen from them due to a vulnerability in third-party software used by the former business partner."[22]

30.    The files accessed and stolen in the Data Breach contained the PII/PHI of Plaintiff and Class members, including names, addresses, phone numbers, email addresses, dates of birth, race, gender, Social Security numbers, as well as clinical information related to inpatient visits, such as place of service, physician name, admission and discharge dates, diagnosis and billing codes, medical record numbers, and insurance information.[23]

31.    Ascension disclosed that the Data Breach affected patient information from "Ascension locations in Alabama, Michigan, Indiana, Tennessee, and Texas."[24]

32.    While Ascension learned of the Data Breach on or about December 5, 2024, and learned Ascension patient information was affected by approximately January 21, 2025, Ascension

---

[20] *Id.*
[21] *Public Notices*, ASCENSION HEALTH (Apr. 28, 2025), https://healthcare.ascension.org/public-notices (last accessed May 14, 2025).
[22] *Id.*
[23] *Id.*
[24] *Id.*

waited until approximately April 28, 2025—well over four months after first learning of the Data Breach—to begin notifying its patients that the Data Breach occurred and that their PII/PHI was accessed and acquired by unauthorized persons.[25] Ascension still has not informed Plaintiff and Class members of the date the Data Breach occurred, the identity of the "former business partner" it disclosed their PII/PHI to or the third-party software their PII/PHI was stolen from.[26]

33.    Ascension's failure to promptly notify Plaintiff and Class members that their PII/PHI was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

### *Ascension Knew that Criminals Target PII/PHI*

34.    At all relevant times, Ascension knew, or should have known, that the PII/PHI that it collected, shared, and stored was a target for malicious actors. Indeed, Ascension has experienced several other recent data breaches and security incidents.[27] Further, Ascension states in its Privacy Policy that it will alert patients in the event of a breach of their PII/PHI. Despite such knowledge, Ascension failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from unauthorized disclosures and cyberattacks that it should have anticipated and guarded against.

35.    It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable

---

[25] *See id.*
[26] *Id.*
[27] *Public Notices*, *supra* note 21.

and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[28]

36.    Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in 2024.[29] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[30]

37.    PII/PHI is a valuable property right.[31] The value of PII/PHI as a commodity is measurable.[32] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[33] American companies are estimated to have spent over $19 billion on acquiring

---

[28] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[29] *Data Breach Outlook*, KROLL, https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025 (last accessed May 14, 2025).

[30] *See id*.

[31] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[32] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[33] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

personal data of consumers in 2018.[34] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

38.     As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

39.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[35] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[36]

40.     All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[37] According to a report released by the Federal Bureau of

---

[34] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[35] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[36] *Id.*

[37] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[38]

41.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[39] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[40]

42.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[41]

43.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[38] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.
[39] Steager, *supra* note 35.
[40] *Id.*
[41] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

*Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

44.    Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[42] [43]

45.    Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[44]

46.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[45]

47.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records

---

[42] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed May 14, 2025).

[43] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[44] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[45] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed May 14, 2025).

that can plague victims' medical and financial lives for years."[46] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[47] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[48] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[49]

48.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

    a.  Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

    b.  Significant bills for medical goods and services neither sought nor received.

    c.  Issues with insurance, co-pays, and insurance caps.

    d.  Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

    e.  Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

    f.  As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

---

[46] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[47] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 38.

[48] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed May 14, 2025).

[49] *Id*.

> g. Phantom medical debt collection based on medical billing or other identity information.
>
> h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [50]

49.     There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[51]

50.     It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### *Damages Sustained by Plaintiff and Class Members*

51.     Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the disclosure, compromise, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

---

[50] *See* Dixon & Emerson, *supra* note 46.

[51] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

## CLASS ALLEGATIONS

52.     This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

53.     Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

54.     Excluded from the Class are Ascension Health and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

55.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

56.     The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. Ascension has reported that the Data Breach affected approximately 437,329 persons.[52]

57.     Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

    a.  Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

---

[52] *Cases Currently Under Investigation*, Dep't Health & Hum. Servs. (Apr. 28, 2025), https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf.

    b.   Whether Defendant had a duty not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

    c.   Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

    d.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiff and Class members;

    e.   Whether Defendant breached its duties to protect Plaintiff's and Class members' PII/PHI; and

    f.   Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

58.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

59.    Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

60.    Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

61.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

62.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

63.     Ascension owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in its possession, custody, or control.

64.     Ascension knew or should have known the risks of collecting, storing, and sharing Plaintiff's and all other Class members' PII/PHI and the importance of maintaining secure systems and procedures. Ascension knew or should have known of the many data breaches that targeted companies that collect and store PII/PHI in recent years.

65.     Given the nature of Ascension's business, the sensitivity and value of the PII/PHI it maintains and shares, and the resources at its disposal, Ascension should have identified the vulnerabilities to its systems and prevented the unauthorized disclosure of PII/PHI and the Data Breach from occurring.

66.    Ascension breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, and sharing PII/PHI with third parties who failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it— including Plaintiff's and Class members' PII/PHI.

67.    It was reasonably foreseeable to Ascension that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, and sharing PII/PHI with third parties who failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

68.    But for Ascension's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

69.    As a result of Ascension's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Ascension's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI

compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT II
## NEGLIGENCE PER SE

70.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

71.     Ascension's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

72.     Ascension's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Ascension, of failing to employ reasonable measures to protect and secure PII/PHI.

73.     Ascension violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to, and sharing PII/PHI with third parties who failed to, use reasonable measures to protect Plaintiff's and other Class members' PII/PHI, by disclosing Plaintiff's and Class members' PII/PHI to an unauthorized third party, by failing to provide timely notice, and by not complying with applicable industry standards. Ascension's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains, stores, and shares, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

74.     Ascension's violation of the HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

75.     Plaintiff and Class members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

76.     The harm occurring as a result of the Data Breach is the type of harm that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Breach.

77.     It was, or should have been, reasonably foreseeable to Ascension that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, and sharing PII/PHI with third parties who failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

78.     The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Ascension's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to

mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**

79.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80.     Plaintiff and Class members gave Ascension their PII/PHI in confidence, believing that Ascension would protect that information. Plaintiff and Class members would not have provided Ascension with this information had they known it would not be adequately protected. Ascension's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between Ascension and Plaintiff and Class members. In light of this relationship, Ascension must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiff's and Class members' PII/PHI.

81.     Due to the nature of the relationship between Ascension and Plaintiff and Class members, Plaintiff and Class members were entirely reliant upon Ascension to ensure that their PII/PHI was adequately protected. Plaintiff and Class members had no way of verifying or influencing the nature and extent of Ascension's or its business associates' data security policies and practices, and Ascension was in an exclusive position to prevent unauthorized disclosures and guard against the Data Breach.

82.     Ascension has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their relationship. It breached that duty by, *inter alia*, disclosing PII/PHI to unauthorized third parties, sharing PII/PHI with companies that failed to properly protect the integrity of the systems containing Plaintiff's and Class members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA,

and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that it collected and maintained.

83.    As a direct and proximate result of Ascension's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Ascension's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT IV
## BREACH OF IMPLIED CONTRACT

84.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

85.    In connection with receiving healthcare services, Plaintiff and all other Class members entered into implied contracts with Ascension.

86.    Pursuant to these implied contracts, Plaintiff and Class members paid money to Ascension, directly or through their insurance, and provided Ascension with their PII/PHI. In exchange, Ascension agreed to, among other things, and Plaintiff and Class members understood that Ascension would: (1) provide services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (3) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

22

87.     The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Ascension, on the other hand. Indeed, as set forth above, Ascension recognized the importance of data security and the privacy of its patients' PII/PHI in its Privacy Policy. Had Plaintiff and Class members known that Ascension would not adequately protect their PII/PHI, they would not have sought healthcare services from Ascension or agreed to provide it with their PII/PHI.

88.     Plaintiff and Class members performed their obligations under the implied contract when they provided Ascension with their PII/PHI and paid for healthcare services from Ascension.

89.     Ascension breached its obligations under its implied contracts with Plaintiff and Class members by failing to implement and maintain reasonable security measures to protect and secure their PII/PHI, disclosing their PII/PHI to unauthorized third parties, sharing their PII/PHI with third parties who failed to implement and maintain security protocols and procedures to protect PII/PHI, and failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

90.     Ascension's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the unauthorized disclosure of their PII/PHI and the Data Breach, and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

91.     Plaintiff and all other Class members were damaged by Ascension's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they

are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost time and incurred money to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) they overpaid for services that were received without adequate data security.

### COUNT V
### UNJUST ENRICHMENT

92.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

93.    This claim is pleaded in the alternative to the breach of implied contract claim.

94.    Plaintiff and Class members conferred a monetary benefit upon Ascension in the form of monies paid to Ascension for healthcare services and through the provision of their PII/PHI.

95.    Ascension accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. Ascension benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was necessary to facilitate Ascension's healthcare operations and billing services.

96.    As a result of Ascension's conduct, Plaintiff and Class members suffered actual, measurable damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures, that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures, that they received.

97.    Ascension should not be permitted to retain the money belonging to Plaintiff and Class members because Ascension failed to adequately implement the data privacy and security

procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

98.     Plaintiff and Class members have no adequate remedy at law.

99.     Ascension should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## **PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendant as follows:

A.     Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.     Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.     Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.     Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.


Dated: May 15, 2025                          Respectfully submitted,

                                             /s/ John S. Steward
                                             John S. Steward #45932MO
                                             **STEWARD LAW FIRM, LLC**
                                             14824 West Clayton Road, Suite 24
                                             Chesterfield, MO 63017
                                             Tel: 314-504-0979
                                             js@molawgroup.com

                                             Ben Barnow*
                                             Anthony L. Parkhill*
                                             **BARNOW AND ASSOCIATES, P.C.**
                                             205 West Randolph Street, Suite 1630
                                             Chicago, IL 60606
                                             Tel: 312.621.2000
                                             Fax: 312.641.5504
                                             b.barnow@barnowlaw.com
                                             aparkhill@barnowlaw.com

                                             *Counsel for Plaintiff*


                                             **Pro hac vice* forthcoming

26